**UNITED STATES of America, Appellee,**

v.

**Michael LOVAGLIA, Martin Clune and Peter Pavlisak, Defendants– Appellants.**

Nos. 418, 419, 310, 421 and 443, Dockets 91–1211, 91–1212, 91–1331, 91–2262 and 91–2264.

United States Court of Appeals, Second Circuit.

Argued Nov. 22, 1991.

Decided Jan. 22, 1992.

Paul J. Cambria, Jr., Buffalo, N.Y. (Lipsitz, Green, Fahringer, Roll, Salisbury & Cambria, Mary Good, of counsel), for defendant-appellant Michael Lovaglia.

Joseph M. LaTona, Buffalo, N.Y. (Lipsitz, Green, Fahringer, Roll, Salisbury & Cambria, Mary Good, of counsel), for defendant-appellant Martin Clune.

John R. Parrinello, Rochester, N.Y. (Redmond & Parrinello, of counsel), for defendant-appellant Peter Pavlisak (taken on submission).

Gregory A. West, Syracuse, N.Y., Asst. U.S. Atty., N.D.N.Y. (Frederick J. Scullin, Jr., U.S. Atty., N.D.N.Y., of counsel), for appellee.

Before OAKES, Chief Judge, FEINBERG and MESKILL, Circuit Judges.

FEINBERG, Circuit Judge:

Michael Lovaglia, Martin Clune and Peter Pavlisak appeal from the sentences imposed upon them by the United States District Court for the Northern District of New York, Thomas J. McAvoy, J. Appellants challenge Judge McAvoy's refusal to recuse himself from the sentencing proceedings. Appellants also claim that the inclusion in their presentence reports of allegations to which they did not specifically plead violated their plea agreements. Appellants ask that the case be remanded for resentencing by a different judge, with a direction that the challenged portions of the presentence reports be excised. For the reasons given below, we affirm.

## Background

This appeal arises out of a 13–count indictment charging defendants Peter Pavlisak, Martin Clune and Michael Lovaglia, who at the relevant times were union offi-

cials, with violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962 et seq. (RICO). The three defendants were charged with using their influence and union positions to extort illegal favors, to induce fear of economic harm and to allocate job opportunities unfairly and illegally.

Rather than facing trial, appellants in January 1991 pled guilty, pursuant to the terms of similar plea agreements, to Count One of the indictment charging each of them with conspiring to conduct the affairs of an enterprise (Laborers Local 7) through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d). Each defendant admitted only the facts set forth in paragraph 3 of their respective agreements and each acknowledged that he could receive a sentence of up to 20 years in prison if convicted after a trial. Paragraph 6 of the plea agreements, pursuant to Fed. R.Crim.P. 11(e)(1)(C), included sentencing limits of five years, three years and two and a half years in prison, respectively, for Pavlisak, Lovaglia, and Clune. Limited fines were also permitted. Paragraphs 7 and 8, which dealt primarily with the evidence that could be presented to the sentencing court by the parties, provided:

7. The parties agree that the Court will independently determine an appropriate sentence in accordance with the terms of this Agreement. Furthermore, nothing contained in this Agreement shall prevent the Government or the Defendant from offering evidence relevant to this determination, nor shall anything contained in this Agreement be construed as any limitation on the right of either the Government or the Defendant to advocate a particular sentence within the limits of Paragraph 6A. and 6B. above. Any recommendation by the Government for a particular sentence shall be done in a separate sentencing memorandum and/or in oral advocacy at the time of sentencing.

8. The Government reserves the right to respond to any information or statements made by [the defendant] or on [the defendant's] behalf which are inconsistent with evidence developed during the course of the Government's investigation. It is further understood that the United States Attorney's Office will provide the United States Probation Office and the United States District Court with all information in its possession which the Government deems relevant with respect to [the defendant's] background, character, and involvement in the crime to which he enters a plea of guilty.

The Government gave up its right to participate in the defendants' parole hearings and recommend a specific parole determination. Thus, paragraph 8 went on to provide: "The United States Attorney will not, however, advocate a parole determination and will not make any sentencing memorandum or transcript of oral advocacy available to the United States Parole Commission."

In February 1991, the government filed a sentencing memorandum with the district court supporting its recommendation that the defendants receive the maximum terms of incarceration allowed by their plea agreements. All three defendants filed replies denying the government's allegations, and submitted their own sentencing memoranda recommending probation or community service in lieu of incarceration.

The sentencing of all three defendants was initially scheduled for March 27, 1991, but Pavlisak's sentencing was rescheduled for April 11, 1991 due to his attorney's unavailability. At the sentencing of Lovaglia and Clune, Judge McAvoy gave counsel for each defendant an opportunity to challenge the presentence reports. Both defendants challenged the reports as containing unsubstantiated allegations. Defendants also sought to limit the scope of the reports by arguing that since the defendants had admitted involvement in only two incidents, the government had breached its plea agreements by offering to prove misconduct other than that involved in those two incidents. The two defendants therefore asked the court to strike from the presentence reports the government's version of the offense beyond those parts pertaining to the admitted incidents of misconduct.

Judge McAvoy ruled that "what the Government submitted certainly was in keeping with the parameters of the agreement" but that "I was sentencing Mr. Lovaglia and Mr. Clune in connection with their plea to the RICO conspiracy based on two overt acts that they admitted to. Not other overt acts that they contest. I am not going to consider those other contested overt acts that have been set forth in the indictment and in the Government's submissions." Judge McAvoy also stated that he would not make any decisions for the parole commission and directed the transmittal to the parole board of everything that had been filed. After a request from the government, however, the judge agreed not to forward the government's sentencing memorandum to the parole board. After hearing from the parties, the judge imposed the maximum sentences allowed under the plea agreement, ordering Lovaglia and Clune to serve, respectively, 36 and 30 months in prison.

One week later, the attorney for Pavlisak (who had not yet been sentenced) sent Judge McAvoy a letter asking him to recuse himself and requesting that the case be reassigned to another judge. Pavlisak's counsel asserted in the letter that there was "a potential conflict of interest and/or appearance of impropriety on [the judge's] part which must be addressed prior to" the sentencing of Pavlisak. The bases for this assertion were that the judge's former law firm had represented one of the construction companies victimized by defendants (the Nick Anthony Construction Company) and that the judge had been involved in an unrelated restaurant business with one of the Nick Anthony shareholders, Ralph Cerretani. Thereafter, based upon the same allegations, Lovaglia and Clune moved to vacate their sentences, to stay the commencement of their prison terms in the meantime and to transfer the resentencing to another judge.

The judge rescheduled Pavlisak's sentencing and heard oral argument from Lovaglia and Clune on April 16, 1991, at which time he explored the disqualification issue with their counsel. On April 25, 1991, the judge issued a memorandum decision and order which denied their applications for a stay. In this opinion, the judge emphasized that his relationship with the Cerretanis, alleged victims of defendants' misconduct, had ended "about seven or eight years ago" and that it had nothing to do with the events underlying the criminal prosecution. He concluded that a reasonable, objective and disinterested observer, knowing all the facts, would not question his impartiality.

The judge subsequently rescheduled the Pavlisak sentencing for May 6, 1991 and at the sentencing hearing he discussed the disqualification question with Pavlisak's attorney. Pavlisak made the same "appearance of impropriety" argument that his co-defendants had made on their motion to vacate. In addition to the facts presented by his co-defendants, Pavlisak noted that the judge had socialized with the Cerretani family when they were in the restaurant business together. In response, the judge emphasized again that any relationship he had had with the Cerretani family "drifted away and ceased" when the restaurant business "ground to a halt." He checked to be sure that neither he nor his former law firm had ever investigated the vandalism allegedly committed by defendants against the Cerretanis or assisted the company in pursuing an insurance claim. He ultimately denied the recusal motion and, upon Pavlisak's motion to have the contested allegations stricken from the presentence report, denied this request, as he had when the other two defendants made the same request at their sentencing hearing.

These appeals followed.

## Discussion

### Recusal

■ Subsection (a) of 28 U.S.C. § 455 provides that judges "shall disqualify [themselves] in any proceeding in which [their] impartiality might reasonably be questioned." The legislative history of this statutory section reveals that it was intended to establish an objective standard designed to promote public confidence in the impartiality of the judicial process. The

new test, though it no longer includes a "duty to sit," "should not be used by judges to avoid sitting on difficult or controversial cases." H.R.Rep. No. 1453, 93d Cong., 2d Sess., reprinted in 1974 U.S.C.C.A.N. 6351, 6355. Furthermore, judges "must be alert to avoid the possibility that those who would question [their] impartiality are in fact seeking to avoid the consequences of [the judge's] expected adverse decision." Id.

█ In deciding whether or not to affirm a judge's denial of a recusal motion, a court of appeals must ask the following question: Would a reasonable person, knowing all the facts, conclude that the trial judge's impartiality could reasonably be questioned? *Apple v. Jewish Hospital and Medical Center*, 829 F.2d 326, 333 (2d Cir.1987). Or phrased differently, would an objective, disinterested observer fully informed of the underlying facts, entertain significant doubt that justice would be done absent recusal? *Deluca v. Long Island Lighting Co., Inc.*, 862 F.2d 427, 428–29 (2d Cir. 1988). Since recusal motions are committed to the sound discretion of the district court, *Apple v. Jewish Hospital and Medical Center*, 829 F.2d at 333, the issue on appeal is whether the court abused its discretion.

█ The rules set forth above governing recusals are obviously formulated in general terms and do not offer bright-line guidelines. However, a number of cases in the federal courts illustrate the kinds of situations that warrant the reversal of a district judge's failure to recuse. Recusal is appropriate when a judge expresses a personal bias concerning the outcome of the case at issue. *United States v. Diaz*, 797 F.2d 99, 100 (2d Cir.1986) (per curiam). Also, recusal is usually warranted when a judge has a direct personal or fiduciary interest in the outcome of the case, regardless of whether or not the judge is actually aware of that interest at the relevant times. *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 850, 859, 108 S.Ct. 2194, 2197, 2202, 100 L.Ed.2d 855 (1988). In addition, disqualification could be warranted if a judge has had contempo-

raneous extrajudicial contact with a close relative of a party who has personal knowledge of outcome-determinative facts. *In re Faulkner*, 856 F.2d 716, 721 (5th Cir. 1988) (per curiam).

█ Where a case, by contrast, involves remote, contingent, indirect or speculative interests, disqualification is not required. See *In re Drexel Burnham Lambert Inc.*, 861 F.2d 1307, 1313 (2d Cir.1988), cert. denied, 490 U.S. 1102, 109 S.Ct. 2458, 104 L.Ed.2d 1012 (1989). Accord, *In re Allied Signal Inc.*, 891 F.2d 974, 976 (1st Cir.1989). A judge's prior representation of one of the parties in a proceeding, for example, does not automatically warrant disqualification. *National Auto Brokers Corp. v. General Motors Corp.*, 572 F.2d 953 (2d Cir.1978), cert. denied, 439 U.S. 1072, 99 S.Ct. 844, 59 L.Ed.2d 38 (1979).

Appellants point to a number of facts to support the conclusion that Judge McAvoy's failure to recuse himself constituted an abuse of discretion. First, they note that the judge or his former law firm incorporated the Nick Anthony Construction Company, a company owned by members of the Cerretani family. Some of the family's business entities were victims of appellants' conduct alleged in a part of the indictment not pled to. Appellants note as well that in 1978 the judge or his firm incorporated Corbisello Quarries, Inc., owned by the Cerretanis. As the government responds, however, Judge McAvoy had no involvement in the Cerretani construction businesses beyond forming their corporations and amending the certificate of incorporation; he had no financial interest in the construction companies; and he was not adversely affected by any damage to their equipment.

█ Second, appellants note that the judge visited one of the client's construction operations and spoke to a member of the Cerretani family about equipment damage. But apart from knowing about some possible vandalism, Judge McAvoy knew nothing of the underlying facts or circumstances, nor did his firm assist the company in pursuing any damage claims. Appellants also note that Judge McAvoy owned

stock in a restaurant business he shared with Ralph and Nick Cerretani, a business which ultimately failed. However, the restaurant business and its failure were entirely unrelated to the construction businesses and therefore to the misconduct charged against appellants in the indictment. The restaurant business gave rise to no knowledge of facts that might be outcome-determinative or even relevant in the matter before the judge, in contrast to *In re Faulkner,* supra.

■ Finally, appellants point to Judge McAvoy's social relationship with the Cerretanis. The judge stated at the Pavlisak sentencing that he had been "very close socially" with the Cerretanis; that he went to the Cerretani home one Christmas morning; that on five or six occasions, he socialized with the Cerretanis and their families at their vacation home; that the judge went to Fort Lauderdale, Florida with Ralph Cerretani and his wife for social purposes; and that the judge saw Michael Cerretani at family gatherings.

Whether we characterize the socializing described above as "an intense relationship," as does Pavlisak or as occasional socializing, as does the government, it is important that we view it in its temporal context. The judge has had no business or social relationship with anyone in the Cerretani family since seven or eight years ago when any relationship "drifted away and ceased."

When the question of his relationship arose at the April 16 hearing on Lovaglia's and Clune's motion to vacate, Judge McAvoy did not specifically mention his having socialized with the Cerretani family. While appellants raise this failure to discuss the social relationship as creating an additional appearance of impropriety by suggesting a cover-up, citing *Liljeberg,* 486 U.S. at 866, 108 S.Ct. at 2205, we believe that viewed in context, it does just the opposite.

At the April 16 hearing, Judge McAvoy noted that he had independently caused a search of his former law firm's records to ensure that the firm had not done any work for the Cerretani Construction Company beyond forming the corporations and amending the certificates of incorporation. He also sought to ensure that neither he nor his firm had handled any equipment damage claims for the Cerretanis. This demonstrates that Judge McAvoy intended a thorough examination of the potential appearance of impropriety. Viewed in this context, the fact that he did not mention that he had in the past socialized with the Cerretanis suggests that this relationship did not strike him as important enough to explore and that the social aspect of the relationship was—as the government argues—de minimis, or difficult to distinguish from the primary business relationship, in large part because whatever feelings might have existed between the Cerretanis and the judge at one point (prior to his appointment to the bench in 1986), had not motivated any invitations or gatherings for seven or eight years. By contrast, in *Liljeberg,* supra, the judge failed to mention that he had a fiduciary financial interest in the outcome of the litigation.

The facts of a First Circuit case, *In re Allied–Signal Inc.,* are quite similar to those in the present case. In that case, counsel for one of the litigants had loaned the district court judge (or his real estate venture) $50,000 in 1978, prior to his appointment to the bench. The loan was repaid in 1979 and the district judge had severed his social relationship with the attorney more than eight years earlier. The First Circuit stated that "[w]e do not see how a series of social or business relationships of the sort of which petitioners complain, between a judge and lawyer, taking place more than eight years ago, before the judge's appointment, could cast significant doubt on the judge's impartiality." 891 F.2d at 976. In reply, Lovaglia and Clune suggest, in effect, that practicalities dictated the decision in that case; i.e., the case involved massive tort litigation arising out of the San Juan, Puerto Rico hotel fire of 1986, and it would have been extremely burdensome to reassign the case to another judge. However, as appellants concede, the court there did not hinge its denial of the recusal motion upon the difficulty of transferring the litigation to another judge.

It could have held that although there might possibly be an appearance of impropriety, the other considerations outweighed that possibility. But it did not; it decided the case on the merits and, we believe, decided it correctly.

Because Judge McAvoy's relationship with the Cerretani family ended seven or eight years prior to sentencing, because he had no specific knowledge of the contested facts, and because the Cerretani allegations were not outcome-determinative in these proceedings, we hold that Judge McAvoy did not abuse his discretion in refusing to recuse himself.

*The plea agreement*

■ Appellants claim that the government violated its plea agreement with each of them by presenting to the sentencing court a memorandum containing allegations of overt acts other than those specifically admitted by each appellant in his plea agreement. The words of the agreements upon which appellants focus are the following: "the United States Attorney's Office will provide the United States Probation Office and the United States District Court with all information in its possession ... with respect to [the defendant's] background, character, and involvement in the crime *to which [he] enters a plea of guilty*" (emphasis added). As already indicated, appellants pled guilty to Count One of the indictment, which charged a conspiracy to conduct the affairs of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d), but they limited their admissions to two specific overt acts specified in paragraph 3 of the plea agreement. Therefore, according to appellants, no other overt acts could be mentioned by the government in making a sentencing recommendation.

Furthermore, add appellants, the government agreed that "[t]he United States Attorney will not ... make any sentencing memorandum or transcript of oral advocacy available to the United States Parole Commission." According to appellants, the intent of these provisions was to limit the sentencing information before the court, and later the parole commission, to the acts to which appellants had pled guilty. According to appellants, since the government submitted to the court a sentencing memorandum containing allegations of conduct not admitted by the defendants, allegations which were incorporated into the presentence report and eventually transmitted to the parole authorities, the government thereby made available its sentencing memorandum to the parole commission in contravention of the plea agreement. We find appellants' position to be without merit.

■ In deciding whether a plea agreement has been breached, a court must look to what the parties to the plea agreement reasonably understood to be its terms. *United States v. Alexander*, 869 F.2d 91, 95 (2d Cir.1989); *Paradiso v. United States*, 689 F.2d 28, 31 (2d Cir.1982) (per curiam), cert. denied, 459 U.S. 1116, 103 S.Ct. 752, 74 L.Ed.2d 970 (1983). Each defendant in the case before us pled guilty to the RICO conspiracy charged in Count One of the indictment. The "crime to which" defendants pled guilty was the RICO conspiracy, not simply the two overt acts specifically admitted by the defendants. Furthermore, the scope of what information the government was allowed to provide for the court was defined as "all information ... which *the Government deems relevant* with respect to [the defendant's] background, character and involvement in the crime to which" defendants pled guilty (emphasis added). Therefore, the *government's* right to determine what is relevant, for sentencing purposes, was protected by the plea agreement. We assume that the government had to act in good faith, but its determination that overt acts not admitted by defendants were relevant to defendants' "background" and "character" (as well as to their "involvement" in the crime of RICO conspiracy) is not even remotely unreasonable. We hold that the government did not violate the plea agreement by supplying the court with that information. Indeed, as we held in *United States v. Williamsburg Check Cashing Corp.*, 905 F.2d 25 (2d Cir.1990), if the agreement required that arguably relevant information be kept from the district

court, "we would not enforce such an agreement because it would be against public policy." Id. at 28.

Appellants' second argument, that the plea agreement was breached by the inclusion of allegations of conduct not admitted by appellants in the information transmitted to the parole authorities, is based on a misreading of the plea agreement. The plea agreement provides that the *"United States Attorney* ... will not make any sentencing memorandum or transcript of oral advocacy available to the United States Parole Commission." (emphasis added). The agreement does not, however, limit the prerogatives of either the probation office or the district court. As it promised, the government did not itself forward any information to the parole commission. Indeed, the government asked the judge not to send its sentencing memorandum to that agency, and the judge complied with this request. The government therefore adhered to the plea agreement and we will not order that any portion of the presentence report be excised.

Because we reject appellants' arguments, we need not reach the government's contentions that Lovaglia and Clune failed to raise their disqualification claims in a timely manner and that they should have commenced their post-conviction proceeding by filing a verified petition under Rule 31(a) of the Local Rules for the Northern District of New York. We have considered all of appellants' other arguments and find them to be without merit.

Affirmed.